1   DONALD AMAMGBO, ESQ.
    AMAMGBO & ASSOCIATES
2   7901 Oakport Street, Suite 4900
    Oakland, California 94621
3   Telephone: (510) 615-6000
    Facsimile:  (510) 615-6025
4

5   REGINALD TERRELL, ESQ.
    THE TERRELL LAW GROUP
6   223 25th Street
    Richmond, California 94804        E-filing
7   Telephone: (510) 237-9700
    Facsimile:  (510) 237-4616
8

9   Attorneys for Plaintiff

10

11                    IN THE UNITED STATES DISTRICT COURT
12              IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14   ROBERT CASTEEL III, UCHENNA          Case No. C07-06343   EMC
     UDEMEZUE, STEVE IKE, individually and on
15   behalf of themselves and all others similarly
16   situated,                            CLASS ACTION COMPLAINT
                                          VIOLATIONS OF THE SHERMAN
17      Plaintiffs,                        ANTITRUST ACT 15 U.S.C. § 1

18        v.                              JURY TRIAL DEMANDED

19   AIR NEW ZEALAND, ALL NIPPON
20   AIRWAY, CATHAY PACIFIC AIRWAYS,
     CHINA AIRLINES, EVA AIRWAYS, JAPAN
21   AIRLINES INTERNATIONAL, MALAYSIA
     AIRLINES, NORTHWEST AIRLINES,
22   QANTAS AIRWAYS, SINGAPORE
     AIRLNES, THAI AIRWAYS, UNITED
23   AIRLINES,

24             Defendants.

25

26

27

28

                        CLASS ACTION COMPLAINT

FILED
DEC 14  AM 11: 37
CLERK
COURT
CALIFORNIA

1    1. Pursuant to the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and

2    all others similarly situated, hereby bring this action for treble damages and injunctive relief under

3    the federal antitrust laws of the United States, Section 1 of the Sherman Antitrust Act of 1890,

4    5 U.S.C. § 1 ("Sherman Act") and Section 4 and 26 of the Clayton Antitrust Act of 1914, 15 U.S.C.

5    §§ 15, 26 ("Clayton Act") against defendants. Plaintiffs complain and allege upon information and

6    belief except as to those paragraphs applicable to the named Plaintiffs, which are based on personal

7    knowledge, as follows:

8                                          **NATURE OF THE ACTION**

9    2. This action arises from a global conspiracy among certain airlines to fix, raise, maintain,

10   and/or stabilize prices for long haul passenger transpacific flights to and from the United States

11   ("passenger air transportation"), and for fixed fuel surcharges on this transportation ("fuel

12   surcharges"). Fuel surcharges are fees charged to passengers by airlines purportedly to compensate

13   the airlines for increased fuel costs.

14   3. Plaintiffs, on behalf of all persons and entities that purchased passenger air transportation,

15   to and from the United States, from any of the defendants and their co-conspirators or any

16   predecessor, subsidiary, or affiliate of each, at any time during the period from 2004 to August 2007

17   (the "class period"), bring this action to recover treble damages and injunctive relief for violations

18   of the United States antitrust laws.

19   4. At all relevant times herein, defendants were airlines hat conducted and sold passenger air

20   transportation, and charged fixed fuel surcharges on that transport, to airline passengers in the

21   United States and throughout the world, including but not limited to flights to and from Los Angeles

22   and t from San Francisco, California. Los Angeles International Airport ("LAX") and San

23   Francisco, International Airport ("SFO") are considered the international U.S. gateways of Asian

24   and Pacific countries. The U.S. Department of Transportation reported that in 2005 LAX and SFO

25   were ranked in the top U.S. Passenger gateways to the world in scheduled passenger service. That

26   year LAX and SFO had 24.6 million gateway passengers, with the foreign share of the passengers at

27   an average 67%.

28

1    5. As further alleged herein, during at least the class period, defendants agreed, combined,

2    and/or conspired with each other to fix, raise, maintain, and/or stabilize the prices of passenger air

3    transportation and fuel surcharges thereon. As a result of defendants' unlawful conduct and

4    conspiracy, plaintiffs and the other class members paid artificially high prices for passenger air

5    transportation and surcharges thereon, and have been damaged accordingly.

6                                **JURIDICTION AND VENUE**

7    6. This complaint is brought under Section 4 o f 16 of the Clayton Act. 15 U.S.C. §§ 15 and

8    26, to obtain injunctive relief and to recover treble damages and costs of this suit, including

9    reasonable attorneys' fees, against defendants for the injuries sustained by plaintiffs and the class

10   members by reason of defendants; violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

11   7. This court has jurisdiction over this action pursuant to 28 U.S.C §§ 1331 and 1337, and

12   Sections 4 of 16 of the Clayton Act, 15 U.S.C §§ 15 and 26

13   8. This court has *in personam* jurisdiction over each of the defendants because each was

14   engaged in an illegal price-fixing scheme and conspiracy that was directed at and/or caused injury

15   to persons and entities residing in, located in, or doing business in the Northern District of

16   California and throughout the Untied States.

17   9. Venue is proper in this judicial district pursuant to 15. U.S. C § 22 and 28 U.S.C § 1391

18   (b), (c), and (d) because during the class period many of the defendants resided, transacted business,

19   were found, or had agents in this district, and because a substantial part of the events giving rise to

20   Plaintiffs' claims occurred, and a substantial portion of the affected trade and commerce described

21   below has been carried out, in this district.

22                              **MULTI-DISTRICT LITIGATION**

23   10. Venue is also proper in the Northern District because that court presides over the multi-

24   district litigation *in re International Air Transportation* and the court has and will be called upon to

25   address complex issues including jurisdiction, the scope of relief which may be accorded, the

26   application of United states' antitrust and airline law, notice and claims procedures for class

27   members within and outside the United States, and the administration and distribution of any funds

28   which may be obtained through settlement and judgment.

1

**PARTIES**

2

### A. Plaintiffs

3      11.  Plaintiff Robert Casteel III is a resident of the State of California, Alameda County.

4   Plaintiff Casteel purchased Passenger Air Transportation and paid fuel surcharges thereon from

5   Defendants Eva, JAL, China and Tia Air during the class period and has suffered pecuniary injury

6   because of the antitrust violations alleged herein.

7      12.  Plaintiff Uchenna Udemezue is a resident of the State of California, Alameda County.

8   Plaintiff Meadows purchased Passenger Air Transportation and paid fuel surcharges thereon from

9   Defendant United and Quantas during the class period and has suffered pecuniary injury because of

10   the antitrust violations alleged herein.

11      13.  Plaintiff Steve Ike is a resident of the State of California, San Mateo County.  Plaintiff

12   Meadows purchased Passenger Air Transportation and paid fuel surcharges thereon from Defendant

13   United Airline during the class period and has suffered pecuniary injury because of the antitrust

14   violations alleged herein.

15      14.  Plaintiffs identified in the preceding three paragraphs are collectively referred to herein

16   as "Plaintiffs".

17

### B. Defendants

18      15.  Defendant **Air New Zealand** is a New Zealand company with its principal place of

19   business at Quay Tower, 29 Customs St. West, Auckland, 1020, New Zealand.  1020, New Zealand.

20   Air New Zealand conducts passenger air transportation throughout the world, including into the

21   U.S. and especially California.

22      16.  Defendant **All Nippon Airways** is a Japanese company with its principal place of

23   business at Shidome-City, 1-5-2, Higashi-Shimbashi, Minato-ku, Tokyo 105-7133, Japan. All

24   Nippon airways conduct passenger air transportation throughout the world, including into the

25   United States and especially California.

26      17.  Defendant **Cathay Pacific Airways** is a Hong Kong-based company with its principal

27   place of business at 9 Connaught Road, Central Swirel Housepox Box 1GPO, Hong Kong K3.

28

CLASS ACTION COMPLAINT

1   Cathay Pacific Airways conducts passenger air transportation throughout the world, including into
2   the United States and especially California.

3       18. Defendant **China Airways** is a Taiwanese company with its principal place of business
4   at 131 Nanking E. Rd., Section 3 Taipei, Taiwan. China Airways conducts passenger air
5   transportation throughout the world, including into the U.S. and especially California.

6       19. Defendant **EVA Airways** is a Taiwanese company with its principal place of business
7   at 16F.-1, No. 207, Fusing Road, Taoyuan City, Taoyuan County, Taiwan. Eva Airways conducts
8   passenger air transportation throughout the world, including into the U.S. and especially California.

9       20. Defendant **Japan Airlines International** is a Japanese company with its principal place
10  of business at 4-11, Higashi-Shinagawa 2-chrome, Shinagawa-Ku, Tokyo 140-5605, Japan Airlines
11  International conducts passenger air transportation throughout the world, including into the United
12  States, especially California.

13      21. Defendant **Malaysia Airlines** is a Malaysian corporation with its principal place of
14  business at MAS Complex A, Sultan Abdul Azia Shah Airport, 47200 Suband, Selangor Darui
15  Shsan, Malaysia, Malaysia Airlines conducts passenger air transportation throughout the world,
16  including into the United States, especially California.

17      22. Defendant **Northwest Airlines** is a Delaware corporation with its principal place of
18  business at 2700 Lone Oak Parkway, Eagan MN 55121. Northwest Airline conducts passenger air
19  transportation throughout the world, including into the United States, especially California.

20      23. Defendant **Qantas Airway** is an Australian company with its principal place of business
21  at 203 Coward Street, Qantas Centre, Mascot NSW 2020 C3. Qantas Airways conducts passenger
22  air transportation throughout the world, including into the United States, especially California.

23      24. Defendant **Singapore Airline** is a Singapore company with its principal place of
24  business at Airline House, 25 Airline Road, 819829 Singapore, Singapore Airlines conducts
25  passenger air transportation throughout the world, including into the United States, especially
26  California.

27

28

1    25. Defendant **Thai Airway** is a Thailand company with its principal place of business at

2    89 Vibhavadi-Rangsit Road, Bangkok, Thailand 10900. Thai Airways conducts passenger air

3    transportation throughout the world, including into the United States, especially California.

4    26. Defendant **United Airlines** is a Delaware corporation with its principal place of

5    business at 77 W. Wacker, Chicago, IL 60601. United Airlines is one of the largest passenger

6    airlines in the world with more than 3,600 flights a day to more than two hundred destinations.

7    United Airlines conducts passenger air transportation throughout the world, including into the

8    United States, especially San Francisco International Airport, where United Airlines operates a hub

9    and maintenance operation center. United Airlines is the largest employer in San Mateo County,

10   California, which is located within this district.

11   **Unnamed Co-conspirators**

12   27. At all relevant times, other airlines, trade groups, or other entities, willingly conspired

13   with defendants in their unlawful restraint of trade. All averments herein against named defendants

14   are also averred against these unnamed co-conspirators as though set forth at length.

15   **Agents**

16   28. The acts alleged to have been done by defendants were authorized, ordered or done by

17   their directors, officers, agents, employees, or representatives while actively engaged in the

18   management of each of the defendants' affaires.

19   **TRADE AND COMMERCE**

20   29. Throughout the class period, there was a continuous and uninterrupted flow of

21   passenger air transportation in international commerce throughout the United States and especially

22   into and out of Los Angeles and San Francisco. Defendants' unlawful activities, as described

23   herein, took place within the flow of commerce to passenger flight customers throughout the world,

24   and had a direct, substantial and reasonably foreseeable effect upon interstate and international

25   commerce in the United States.

26   **PLAINTIFFS AND THE CLASS SUFFERED INJURY THROUGH**

27   **COLLUSIVE PRICE INCREASES AND SURCHARGES**

28

1  30. As defendants controlled a vast majority of the passenger flight services during the class

2  period with their dominant combined market share, passenger flight customer were unable to shop

3  for passenger air transportation from other carriers during that period, because of the lack of

4  competition which allowed defendants to reap enormous profits from the fuel surcharges.

5  31. In addition, fuel surcharges were often treated by defendants and other carriers similar

6  to a tax or other surcharge, such as an airport facility charge or a government mandated September

7  11 security charge. As suck, fuel surcharges were not always advertised as part of defendants'

8  fares, and were added on to the base fare as part of the purchase transaction.

9  32. Because surcharges generally are designed to compensate for increased external costs,

10  they should bear a relatively constant relationship to external cost levels. Thus, in a competitive

11  market, fuel surcharges should raise and fall at relatively constant ratios to the associated jet fuel

12  costs. Since their inception in 2004,

13  33. The ratio of defendants' profits to external costs was therefore quite high due to the

14  concerted implementation and maintenance of the agreed-upon passenger air transportation and fuel

15  Surcharge price levels. So despite increased fuel costs during the class period, defendants'

16  surcharges were actually responsible for outstanding *profit growth* for defendants beyond record

17  fuel costs.

18  ## CLASS ACTION ALLEGATIONS

19  34. Plaintiffs bring this action on their own behalf and as a class action pursuant to Federal

20  Rules of Civil Procedure 23 (a) and 23 (b) (3) on behalf of the following class:

21

22  All individuals or entities (excluding governmental entities,
defendants, and their parents, predecessors, subsidiaries, affiliates,

23  and their co-conspirators) who purchased passenger air
transportation, for long haul transpacific flights and who paid a

24  fuel surcharge on their tickets from any of the defendants and their
co-conspirators or any predecessor, subsidiary, or affiliate of each,

25  at any time during the period from 2004 to August 2007.

26  35. Because such information is in the exclusive control of defendants, Plaintiffs do not

27  know the exact number of class members. Due to the nature of the trade and commerce involved,

28  however, Plaintiffs believe that class members number at least in the thousands and are sufficiently

numerous and geographically dispersed throughout the United States and the world so that joinder of all class passengers traveling to the Pacific out of California in 2006.

36. There are questions of law or fact common to the class, including:

    a. Whether defendants engaged in a combination or conspiracy among themselves to fix, raise, maintain, and/or stabilize passenger air transportation and Surcharge prices charged effecting commerce in the United States and throughout the world;

    b. The duration of the conspiracy alleged in this complaint and the nature and character of the acts performed by defendants in furtherance of the conspiracy;

    c. Whether the alleged conspiracy violated Section 1 of the Sherman Act;

    d. Whether the conduct of defendants, as alleged in this Compliant, caused injury to the businesses or property of plaintiffs and the other class members;

    e. The effect of defendants' conspiracy on the passenger air transportation and Surcharge prices charged in the United States and throughout the world during the class period; and

    f. The appropriate measure of damages sustained by plaintiffs and other class members.

37. Plaintiffs are class members. Plaintiffs' claims are typical of the claims of the class members. Plaintiffs purchased passenger air transportation and surcharges from one or more defendants, and their interests are coincident with and not antagonistic to those of other class members. Plaintiffs are represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

38. The question of law and fact common to the class members predominate over any questions affecting only individual members.

39. A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

40. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as I asserted in this Compliant.

41. This class action presents no difficulties in management that would preclude maintenance as a class action. Finally, the class is readily definable and is one for which records of the names and addresses of the class members exist in the files of defendants.

## DEFENDANTS AND THE PASSENGER FLIGHT MARKET

42. Each Defendant possesses significant market share on their routes of travel.  The principal competitors for the defendants in the transpacific long haul passenger air transportation market are therefore,

43. Passenger air transportation is a commodity product that is fungible in the sense that passenger air transportation is a homogenous service sold by airlines, including defendants, to airline customers, including plaintiffs and the class members, primarily based on price.

44. The passenger air transportation market in the United States and worldwide is highly concentrated, and there exist substantial barriers to entry in this market; both factors facilitate the implementation and maintenance of a horizontal price-fixing cartel such as that perpetrated by defendants and alleged herein.

## DEFENDANTS' CONCERTED FUEL SURCHARGES

45. Generally, surcharges are a feature of the global air transportation market, in which airlines charge extra fees to their customers, above and beyond basic flight rate charges, with the intent of defraying certain external costs of the carriers.

46. Beginning in 2004, defendants agreed to act in concert with one another in demanding the Surcharges to defray fuel costs and agreeing when and how much to increase the surcharges to their passenger customers flight.

47. Defendants were aware that their imposition of fuel surcharges and other surcharges would not be successful in their supposed competitors did not join them; otherwise, customers would be free to seek out lower prices.   For this reason, defendants entered into agreements to raise surcharges at the same times and in the same amounts.

48. But the defendants' passenger air transportation conduct, defendants would have been unable to perpetrate the extent to which they increased the prices of their fuel surcharges.

49. The collusion of Japan Airlines International and All Nippon airways ("ANA") is representative of the behavior of the other defendants.  Japan Airlines International and ANA agreed to raise and lower fares on nearly always the same dates and were in lockstep on surcharges for transpacific fares:

| | |
|---|---|
| June 8, 2004, ANA files a notice with the Japanese government to raise IATA international fares, in the wake of increased fuel prices, to and from Japan, effective **July 1,  5%** | June 8, 2004, ANA Japan Airlines files a notice with the Japanese government to raise international fares, in the wake of increased fuel prices, to and from Japan, effective **July 1, 5%** |

hike, exception North America economy fares, but not business class.

January 5, 2005, ANA, announces it will add fuel surcharges on international fares on **February 1.**  The surcharges for transpacific flights were 2500 yen.

June 3, 2005 Japan Airlines files a notice with the Japanese government to raise its international fuel surcharge effective **July 1.**

January 16, 2006, Japan Airlines, files a notice with the Japanese government to raise its international fuel charge effective **March 1.**

August 17, 2006 Japan Airlines, files a notice with the Japanese government to raise its international fuel surcharge, effective **October 1.** From 8,000 yen to 13,600 yen ($66. To $113).

November 16, 2006 Japan Airlines, files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective January **1,** lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108).

March19, 2007 Japan Airlines, files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective May **1,** to 11,000 or $91.

May 15, 2007 Japan Airlines, files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective **July 1,** to 11,000 yen or $91 to 12,000 yen or $100.

August 15,, 2007 Japan Airlines, files a notice with the Japanese government to raise the fuel surcharge on international passenger fares

hike, exception North America economy fares, but not business class.

January 20, 2005, Japan Airlines announces it will add fuel surcharges on international passenger fares on **February 1.**  The surcharges for transpacific flights were 2500 yen.

June 7, 2005 ANA files a notice with the Japanese government to raise its international fuel surcharge effective **July 7.**

January 23, 2006, ANA files a notice with the Japanese government to raise its international fuel charge effective **March 1.**

August 31, 2006 ANA, files a notice with the Japanese government to raise its international fuel surcharge, effective **October 15.** From 8,000 yen to 13,600 yen ($66. To $113).

November 16, 2006 ANA, files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective January **1,** lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108).

March 20, 2007 ANS, files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective May **1,** to 11,000 or $91.

May 25, 2007 ANA, files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective **July 10,** to 11,000 yen or $91 to 12,000 yen or $100.

August 20,, 2007 ANA, files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective

effective **October 1,** from 12,000 yen or $100 to    **October 1,** from 12,000 yen or $100 to 13,000
13,000 yen or $108.                                     yen or $108.

## CARTELL-LIKE TRADE ORGANIZATIONS

50. Defendants' executives, as well as other air carriers' executives, met formally or informally over the years at various trade meetings or meetings of trade associations, such as the International Air Transport Association, the Association of Asian Pacific airlines, OneWorld, Star Alliance and Sky Team alliance. At one or more of these meetings defendants conspired to artificially inflate fuel surcharges 0n international passenger air transportation.

51. One of the keys to the conspiracy is the 42-year-old **Association of Asia Pacific Airlines** ("AAPA"). The 17-member trade association, based in Kuala Lumpur, Malaysia, is the most significant group representing Asia/Pacific carriers. The AAPA boasts that its "member airlines carry 285 million passengers and 10 million tons of cargo representing approximately one-fifth of global passenger traffic and one-third of global air cargo traffic respectively." Ten of the defendants are members of AAPA.

52. The primary purpose of AAPA is to serve as a forum for members' views of issues of common interest and to foster close cooperation. According to the organization, "AAPA speaks with a common voice on behalf of the Asia Pacific carriers and puts forward Asian perspectives when dealing with governments, aircraft manufactures, airport authorities and other organizations on industry issues. The activities of the Association cover every aspect of civil aviation where the airlines feel they can work together for mutual benefit. In addition, AAPA retains access to specialized legal and aviation consultants in Brussels and Washington, a reflection of the significant impact which the profusion of U.S and E.U. regulatory developments have on all international carriers including Asia Pacific airlines.

53. AAPA was formed during a meeting of Asian airline executives in 1965 to discuss regional cooperation. The following year, Philippine Airlines, China Airlines, Korean Airlines and Malaysian Airlines officially formed the Orient Airlines Research Bureau. The group evolved into the Orient Airlines Association and in 1996 changed its name to Association of Asia Pacific Airlines.

54. Another key to the conspiracy is the Geneva-based International Air Transport Association. All of the defendants are members of the IATA, which was founded in 1945 in Havana, Cuba. IATA represents more than 240 airlines comprising 94% of scheduled international air traffic. It describes itself as "the prime vehicle for inter-airline cooperation. " It was an

agreement reached at an IATA meeting in Geneva on May 28, 2004 that played a role in triggering the fuel Surcharge conspiracy.

55. Alliance memberships by airline:

**Air New Zealand**

- Member of the Association of Asia Pacific Airlines.
- Member of the Star Alliance.
- Member of the International Air Transport Association.

**All Nippon**

- Member of the Association of Asia Pacific Airlines.
- Member of the Star Alliance.
- Member of the International Air Transport Association.

**American Airline**

- Member of OneWorld.
- Member of the International Air Transport Association.

**Cathay Pacific Airways**

- Member of the Association of Asia Pacific Airlines.
- Member of OneWorld.
- Member of the International Air Transport Association.

**China Airlines**

- Member of the Association of Asia Pacific Airlines.
- Member of the International Air Transport Association.

**EVA Airlines**

- Member of the Association of Asia Pacific Airlines.
- Member of the International Air Transport Association.

**Japan Airlines International**

- Member of the Association of Asia Pacific Airlines.
- Member of OneWorld.
- Member of the International Air Transport Association.

**Malaysia Airlines**

- Member of the Association of Asia Pacific Airlines.
- Member of the International Air Transport Association.

**Northwest Airlines**

- Member of SkyTeam Alliance.
- Member of the International Air Transport Association.

**Qantas Airways**

- Member of the Association of Asia Pacific Airlines.
- Member of OneWorld.
- Member of the International Air Transport Association.

**Singapore Airlines**

- Member of the Association of Asia Pacific Airlines.
- Member of Star Alliance.
- Member of the International Air Transport Association.

**Thai Airways**

- Member of the Association of Asia Pacific Airlines.
- Member of Star Alliance.
- Member of the International Air Transport Association.

**United Airlines**

- Member of Star Alliance.
- Member of the International Air Transport Association.

## CODE SHARING BUSINESS PARTNERSHIP

56. In addition to the four different alliances/trade groups, various defendants are in effect business partners with each other through what is called code sharing. Code sharing is a business term which was first originated in 1990 when Qantas Airways and American Airlines combined services between an array of U.S. and Australian cities. Code sharing is a legal business arrangement. However, it provides a mechanism to conduct illegal activity.

57. A code share is part of a "cooperative services" agreement between the two carriers. It refers to the practice where a flight operated by an airline is jointly marketed as a flight for one or more other airlines. Most major airlines today have code sharing partnerships with other airlines. "Code" refers to the identifier used in flight schedule, generally the 2-character International Air Transport Association airline YY, could be sold by airline ZZ as ZZ456. It is a business partnership that allows airlines to earn revenue by selling tickets on a partner's flight.

58. According to the U.S. Department of Transportation and defendants, the following are the code sharing partnership of the defendants listed alphabetically:

Air New Zealand / EVA Airways

Air New Zealand / Qantas (Tasman route)

Air New Zealand / Japan Airlines International

Air New Zealand / Northwest Airlines

Air New Zealand / Singapore Airlines

Air New Zealand / Thai Airways

Air New Zealand / United Airlines

All Nippon Airways / Asiana Airlines

All Nippon Airways / EVA Airways

All Nippon Airways / Singapore Airlines

All Nippon Airways / United Airlines

Cathay Pacific Airways / American Airlines

Cathay Pacific Airways / Japan Airlines International

China Airlines / American Airlines

China Airlines/ Thai Airways

EVA Airways / Air New Zealand

EVA Airways / American Airlines

EVA Airways / All Nippon Airways

EVA Airways / Qantas

EVA Air / American Airlines

Japan Airlines International / Air New Zealand

Japan Airlines International / American Airlines

Japan Airlines International / Cathay Pacific

Japan Airlines International / Korean Air

Japan Airlines International / Northwest Airlines

Japan Airlines International / Qantas Airlines

Japan Airlines International / Singapore Airlines

Japan Airlines International / Thai Airways

Malaysia Airlines / All Nippon Airways

Malaysia Airlines / Thai Airways

Northwest Airlines / Air New Zealand

Northwest Airlines / Asiana Airlines

Northwest Airlines / Japan Airlines International

Northwest Airlines / Korean Air

Qantas Airways / Air New Zealand

Qantas Airways / American Airlines

Qantas Airways / EVA Airways

Qantas Airways / Japan Airlines International

Singapore Airlines / Air New Zealand

Singapore Airlines / Asiana Airlines

Singapore Airlines / All Nippon Airways

Singapore Airlines / Malaysian Airlines

Singapore Airlines / United Airlines

Thai Airways / Air New Zealand

Thai Airways / China Airlines

Thai Airways / Japan Airlines International

Thai Airways / Malaysian Airlines

Thai Airways / United Airlines

United Airlines / Air New Zealand

United Airlines / Asiana Airlines

United Airlines / Singapore Airlines

United Airlines / Thai Airways

## CARTEL ACTIVITY MEETINGS

59. Over the years, executives of the Defendant airlines have attended numerous meetings where cartel-like activity was accomplished. Here are a few examples of meetings where executives discussed and agreed on fuel surcharges:

**The International Air Transport Association, Special Meeting, Geneva, May 28, 2004.** fuel costs were the main topic of this meeting and there were agreements on how to add surcharges for fuel. The Montreal Gazette reported on June 1, 2004, that "member carriers of the International Air Transport Association might raise international fares by as much as five percent to help cover a surge in jet fuel costs. The proposed fare increase of between two percent an d five percent was agreed at a May 28 meeting on the association, which represent more than 270 airlines worldwide, an IATA spokesperson said."

**The International Air Transport Association Annual General Meeting and World Air Transport Summit, Singapore, June 6-8-, 2004.** More than 600 airlines executives attended this annual summit. Giovanni Bisignani, IATA CEO said in a welcoming statement, "While record high fuel prices challenge our profitability it is time to put our efforts toward rebuilding the industry."

Immediately following this meeting on June 8, 2004 both Japan Airlines International and All Nippon Airways filed applications with the Japanese government to raise international passenger fares because of high fuel costs. In a news release announcing the fuel Surcharge hike, Japan Airlines International said:

> **"The application follows a special meeting of the members of the International Air Association in Geneva, May 28, (2004) when a resolution was discussed to raise fares in the wake of increased fuel prices. This resolution has now been adopted."**

Japan Airlines International and All Nippon Airways were in lockstep on June 8, 2004, both announcing on that day that a five percent fuel Surcharge would be go into effect, on the same day for both airlines, July 1, 2004.

**2005 International Flight Services Association, Global Leadership Conference – Asia Pacific, August 30 – September 1, 2005 Tokyo Japan:** This meeting was labeled as "The Challenge of Change." Among the participants were, Makoto Fukada, Managing Director and Senior Vice President International Passenger, Japan Airlines; Sandra Pineau, Senior Director of Planning and Design, Continental Airlines; Charles Grossrieder, a manager at Cathay Pacific Airways; Nikom Raviyan, vice President, Thai Airways; Sandeep Bahl, General Manger, Northwest Airlines, Shigeru Miyata, Vice President, Japan Airlines; Kriengsakdi Phatharacharukul, Director, Thai Airways; and Hee Won Jo, Senior Manager, Asiana Airlines.

**Aviation Emergency Response 2006, AAPA sponsored, September 19-21, 2006 Bangkok, Thailand:** This meeting was attended by international airport officials and AAPA member executives. Meetings were held on increasing revenues in the transpacific area by way of fuel surcharges and other financial means.

**3rd Annual Asia Pacific & Middle East Aviation Outlook Summit, November 9-10, 2006 Singapore:** Participating in this meeting were executives from most of the Defendant airlines, including Geoff Dixon, CEO of Qantas and Huang Cheng Eng, Executive VP for Singapore Airlines. One of the issues presented and discussed was *"Fighting Costs: fuel prices and managing risk exposure."*

**AAPA Forum, November 28-29, 2006 Bandar Seri Begawan, Brunei Darussalam:** More than 120 aviation industry stakeholders attended this meeting, organized by AAPA. At this meeting, defendants and others discussed surcharges.

**Asia Pacific Aviation Summit, July 24-25, 2007 Sydney, Australia:** The meeting was put on by the Asia Pacific aviation industry. Some of the issues discussed included the impact of the

investigation by the U.S. Department of Justice into fare price fixing. Another topic was "working together efficiently" to diffuse the investigation of added surcharges.

## THE INVESTIGATION

60. The U.S. Department of Justice ("DOJ") started investigation air passenger fuel surcharge conspiracies worldwide in 2006, particularly transatlantic routes and transpacific routes to and from the West Coast. The DOJ announced on August 1, 2007 a $300 million settlement with British Airway and it cited passenger transatlantic routes. In the news release, the DOJ said: "The Department also charged that between August 2004 and February 2006, British Airways engaged in a conspiracy to suppress and eliminate competition by fixing the fuel Surcharge charged to passengers on long-haul international flights, including flights between the United States and the United Kingdom."

61. The DOJ also focused on **transpacific flights** to and from the United States, noting that investigation is: "ongoing" and includes other defendants named herein.

62. The DOJ also announced a settlement with Korean Air for fare price fixing on flights from the United States to Korea. The DOJ stated that Korean Air has "agreed to cooperate with the Department's ongoing investigation." Korean Air's unnamed co-conspirator in the passenger fare price fixing via fuel surcharges was widely reported to be Asiana Airlines, which sought amnesty.

63. Under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, a company can apply for leniency form the Department of Justice for its participation in antitrust activates. Under the so-called Corporate Leniency Program, if a company comes forward with information about antitrust activities and cooperates in the investigation, it is eligible for conditional amnesty from prosecution.

64. Both Korean Air and Asian Airlines are among the top transpacific carriers in the world. It was not the first time Korean Air and Asiana Airlines have been implicated in collusion and anticompetitive behavior. The Korean Fair Trade Commission fined Korean Air and Asiana in 2001 for conspiring to set passenger air transportation services in Korea.

65. In addition, several o f the defendants and unnamed co-conspirators have been identified as targets and or subjects in international investigations by the U.S. Department of Justice and the European Union into air cargo fuel surcharge price fixing. The targets, many of which are also named in civil suits, include Defendant All Nippon Airways, Defendant American Airlines, Asiana Airlines, Defendant Japan Airlines, Korean Airlines, Defendant Northwest Airlines, Defendant Qantas Airways and Defendant United Airlines. In both the passenger and cargo

investigations, defendants and other airlines are accused of developing and participating in conspiracies to increase revenue by assessing inflated fuel surcharges.

## ADMISSIONS BY CO-CONSPIRATORS

66. On August 13, 2007, Qantas Chief Executive Officer Geoff Dixon announced that **Qantas Airways** would set aside $40 million to cover a potential fine in the United States as a result of fuel surcharges and price fixing in its freight division. In a news release, Dixon was quoted as saying:

> **"On 1 August 2007, the U.S Department of Justice announced that British Airways and Korean Air had agreed to plead guilty and pay separate US$300 million criminal fines for their roles in *conspiracies to fix prices of passenger and cargo flights.* British Airways subsequently announced that US$200 million of its fine related to cargo. Based on these developments, a decision has been made to make a US$40 million (A$47 million) provision in 2006/07 Financial Accounts."**

Dixon was also quoted as saying:

> **"We have investigated this issue thoroughly and are confident that the unacceptable conduct was limited to a small number of people."**

67. On October 6, 2007, the Japanese daily newspaper *Asahi Shimbun* reported that Japan Airlines International would book a roughly $171 million charge for potential fines from a global price fixing probe by U.S. and European Union officials. The newspaper said:

> **"The company's move comes after the U.S. Justice Department fined British Airways PLC and Korean Air Lines Co. $300 million each in August for fixing the prices of passenger and cargo flights with other airlines. The companies allegedly conspired to set fuel surcharges when oil prices rose."**

68. During the class period defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize the prices of Passenger 'Air Transport and fuel surcharges in the United States and throughout the world in violation of Section 1 of the Sherman Act, 15 U.S. C. §1.

69. In formulating and effectuating the alleged contract, combination, or conspiracy, defendants engaged in anti-competitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the prices of Passenger Air Transport and fuel surcharges. 69. These activities included the following:

a.   agreeing to charge prices of Passenger Air Transport and fuel surcharges at certain
levels and otherwise to fix, raise, maintain, and/or stabilize the prices of Passenger Air
Transport and fuel surcharges charged in the United States and throughout the world;

b.   charging Passenger Air Transport and fuel surcharges at the agree-upon rates;

c.   signaling increases in the price of Passenger Air transport and fuel surcharges by,
*inter alia,* publicly announcing their increases;

d.   moving prices of their Passenger Air Transport and fuel surcharges in lockstep; and

e.   announcing new Passenger Air Transport and fuel surcharges prices nearly
simultaneously or within days of each other.

70.  During the class period, the defendants increased, as a ratio to external costs – and
profits – the Passenger Air Transport and fuel surcharges they charged. Theses increases in
Passenger Air Transport and fuel surcharges cannot be explained by actual increases in fuel prices
or supply/demand forces, but rather were the result of anticompetitive conduct.

71.  During the class period, plaintiffs and class members purchased passenger air
transportation directly from defendants (or their agents, subsidiaries, and/or controlled affiliates).

72.  The illegal combination and conspiracy alleged herein has had the following effects,
among others:

a.   Price competition in the pricing of passenger air transportation and fuel surcharges
thereon has been restrained, suppressed, and/or eliminated.

b.   Price competition in the contracting of passenger air transportation has been
restrained, suppressed, and/or eliminated;

c.   Price for passenger air transportation and fuel surcharges thereon charged by
defendants have been fixed, raised, maintained, and/or stabilized at artificially high, non
competitive levels; and

d.   Members of the class have been deprived of the benefit of free and open competition.

## FRAUDULENT CONCEALMENT

73.  Throughout the relevant period, defendants affirmatively and fraudulently concealed
their unlawful conduct from plaintiffs and the class.

74.  Plaintiffs and class members did not discover, and could not discover through the
exercise of reasonable diligence, that defendants were violating the antitrust laws as alleged herein
until shortly before this litigation was commenced.  Nor could plaintiffs and the class members have
discovered the violations earlier than that time because defendants conducted their conspiracy in
secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and

1    fraudulently concealed their activities through various other means and methods designed to avoid

2    detection. The conspiracy was by its nature self-concealing.

3    75. Plaintiffs and the class members could not have discovered the unlawful conduct at an

4    earlier date through the exercise of reasonable diligence because of defendants' active and

5    purposeful concealment of their unlawful activities.

6    76. Defendants engaged in a successful, illegal price-fixing conspiracy with respect to
     surcharges and other fees, which they affirmatively concealed, in at least the following respects:

7        a.  By agreeing among themselves not to discuss publicly, or otherwise reveal, the
8            nature and substance of the acts and communications in furtherance of their illegal
             scheme;

9        b.  By engaging in secret meetings and telephone calls in order to further their illicit
10           passenger air transportation and fuel surcharges cartel; and/or

11       c.  By giving false and pretextual reasons for their pricing for passenger air
12           transportation and fuel surcharges thereon, and their increases, during the relevant period
13           and by describing such pricing and increases falsely as being the result of external costs
             rather than collusion.

14   77. Because of defendants 'fraudulent concealment of their conspiracy, plaintiffs and the

15   class assert the tolling of any applicable statute of limitations affecting the rights of action of

16   plaintiffs and the class members.

17                          **INJURY TO PLAINTIFFS AND THE CLASS**

18   78.  During the class period, plaintiffs and the class members, because of defendants'

19   antitrust violations, paid surcharges and other fees they would not have paid absent such violations.

20   79.  Plaintiffs and the class members it seeks to represent have been injured and damaged in
     their business and property in an amount to be determined according to proof.

21   80.  Because of the illegal conspiracy, plaintiffs and the class members have been injured

22   and financially damaged in their respective businesses and property, in that they have paid

23   surcharges and other fees during the class period they would not have paid in the absence of the

24   illegal conspiracy

25                               **PRAYER FOR RELIEF**

     WHEREFORE, Plaintiffs pray that:
26
         A. The court determine that this action may be maintained as a class action under Rule 23(a)
27          and (b) (3) of the Federal Rules of Civil Procedure;

28

                               CLASS ACTION COMPLAINT

B. The court adjudge and decree that the contract, combination and conspiracy alleged herein is a per se unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C. Judgment be entered against defendants, jointly and severally, and in favor of plaintiffs and the class for damages as allowed by law as determined to have been sustained by them;

D. Each of the defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or effect in restraining competition;

E. The court award plaintiffs and the class attorneys' fees and costs, and pre-judgment interest as permitted by law; and

F. The court awards plaintiffs and the class such other and further relief as may be necessary and appropriate.

DATED:    12/12/07

By: _Reginald Terrell_

DONALD AMAMGBO, ESQ.
AMAMGBO & ASSOCIATES
7901 Oakport Street, Suite 4900
Oakland, California 94621
Telephone: (510) 615-6000
Facsimile: (510) 615-6025

REGINALD TERRELL, ESQ.
THE TERRELL LAW GROUP
223 25th Street
Richmond, California 94804
Telephone: (510) 237-9700
Facsimile: (510) 237-4616

1

## **JURY TRIAL DEMAND**

2

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the

3

claims asserted in this complaint so triable.

4

5    DATED: 12/12/07

6                                        By: _____
                                              DONALD AMAMGBO, ESQ.
7                                             AMAMGBO & ASSOCIATES
                                              7901 Oakport Street, Suite 4900
8                                             Oakland, California 94621
                                              Telephone:  (510) 615-6000
9                                             Facsimile:  (510) 615-6025

10                                            REGINALD TERRELL, ESQ.
                                              THE TERRELL LAW GROUP
11                                            223 25th Street
                                              Richmond, California 94804
12                                            Telephone:  (510) 237-9700
                                              Facsimile:  (510) 237-4616
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT